UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| STEVEN ELLIOT LLC, Individually and on Behalf of All Others Similarly Situated, | § § § § | Civil Action No. |
| | | CLASS ACTION |
| Plaintiff, | § § | |
| vs. | § § | |
| ROBERT G. PHILLIPS, TIMOTHY H. DAY, HARDY MURCHISON, MICHAEL G. FRANCE, JOEL C. LAMBERT, VANESSA GOMEZ LAGATTA, ALVIN BLEDSOE, PHILIP D. GETTIG, JOHN W. SOMERHALDER II, CRESTWOOD MIDSTREAM PARTNERS LP, CRESTWOOD HOLDINGS LLC, CRESTWOOD GAS SERVICES GP LLC, INERGY, L.P., INERGY MIDSTREAM, L.P., NRGM GP, LLC, INTREPID MERGER SUB, LLC and CITIGROUP GLOBAL MARKETS INC., | § § § § § § § § § § § § § § § § § | |
| Defendants. | § § | |

**COMPLAINT FOR BREACH OF FIDUCIARY DUTIES AND VIOLATIONS OF FEDERAL SECURITIES LAWS**

Plaintiff Steven Elliot LLC ("plaintiff"), by and through the undersigned counsel, individually and on behalf of all other similarly situated unitholders of Crestwood Midstream Partners LP ("Crestwood" or the "Company"), brings the following Complaint for Breach of Fiduciary Duties and Violations of Federal Securities Laws against Crestwood; Crestwood Gas Services GP LLC ("Crestwood GP"), the general partner of Crestwood; the members of the Board of Directors of Crestwood GP (the "Board" or "Individual Defendants"); Crestwood Holdings LLC ("Crestwood Holdings"), the parent company of Crestwood; Inergy L.P.; NRGM GP, LLC ("NRGM"), the general partner of Inergy Midstream L.P. ("Inergy Midstream"); Inergy Midstream, the indirect parent  company of NRGM (Inergy L.P., NRGM and Inergy

Midstream are collectively referred to herein as "Inergy"); Intrepid Merger Sub, LLC, a wholly-owned subsidiary of Inergy Midstream; and Citigroup Global Markets Inc. ("Citigroup"). Plaintiff makes the following allegations upon knowledge as to plaintiff and upon information and belief (including investigation of counsel and review of publicly available information) as to all other matters, and alleges as follows:

## SUMMARY OF THE ACTION

1.     This is a unitholder class action brought on behalf of the holders of Crestwood common units against Crestwood, the Board of Directors of Crestwood's general partner, Crestwood GP, and Inergy and its affiliates for breaches of fiduciary duty and/or other violations of state and federal law, and/or aiding and abetting thereof, arising out of defendants' attempt to consummate the proposed acquisition of Crestwood by Inergy (the "Proposed Acquisition") pursuant to an unfair process and for an unfair price.  This matter arises out of defendants' dissemination of a false and misleading proxy statement in violation of §§14(a) and 20(a) of the Securities Exchange Act of 1934 ("1934 Act") and Securities and Exchange Commission ("SEC") Rule 14a-9 promulgated thereunder, and the Board's breaches of their fiduciary duties owed to the Company's unitholders under state law.

2.     Crestwood is a master limited partnership focused on providing midstream infrastructure solutions for the development of North American shale and unconventional resource basins.  Crestwood's operations include natural gas gathering, processing, treating and compression services for natural gas and natural gas liquids produced from the Barnett Shale in north Texas, the Fayetteville Shale in northwest Arkansas, the Granite Wash area in the Texas Panhandle, the Avalon Shale area of Southeastern New Mexico, the Haynesville/Bossier Shale in western Louisiana, and the Marcellus Shale in northern West Virginia.  Crestwood's general

partner is owned and managed by Crestwood Holdings, a partnership between First Reserve Corporation and the Crestwood management team.

3.      Inergy L.P. is a publicly traded master limited partnership.   Inergy L.P.'s operations include a natural gas storage business in Texas and a natural gas liquids supply logistics, transportation and marketing business that serves customers in the United States and Canada. Through its general partner interest and majority equity ownership interest in Inergy Midstream, Inergy L.P. is also engaged in the development and operation of natural gas, natural gas liquids and crude oil storage, transportation and logistics businesses in the Northeast region of the United States and in North Dakota.  Inergy Midstream is a publicly traded master limited partnership engaged in the development and operation of natural gas, natural gas liquids and crude oil storage, transportation and logistics businesses in the Northeast region of the United States and in North Dakota.

4.      On May 6, 2013, Crestwood and Inergy announced that they had entered into a definitive agreement (the "Merger Agreement") whereby Inergy would acquire all of Crestwood's outstanding units.  Each Crestwood common unit held by a Crestwood unitholder other than a Crestwood affiliate will receive 1.07 Inergy Midstream units and $1.03 in cash. Each outstanding unit owned by the entities affiliated with Crestwood (Crestwood Holdings and Crestwood GP) will receive 1.07 Inergy Midstream units for each unit they own of Crestwood. Upon completion of the transaction, Crestwood will become a wholly-owned subsidiary of Inergy Midstream.   Crestwood unitholders will hold approximately 42.9% of the aggregate number of Inergy Midstream common units outstanding immediately following the consummation of the merger.

5.      Thereafter, on May 29, 2013, defendants caused a Registration Statement on Form S-4 (the "S-4") to be filed with the SEC and disseminated in connection with the upcoming

unitholder vote.  The S-4 contains a number of false and misleading statements that are material to unitholders who are expected to rely upon the S-4 to determine whether to approve the Proposed Acquisition.  The S-4 omits a number of material facts necessary to make statements made therein not false and misleading, including the events leading to the merger agreement, the analysis conducted by the Board's financial advisors, and the conflicts of interest burdening the various parties to the deal, including one of Crestwood's financial advisors, Citigroup.

6.     The S-4 omissions and misrepresentations are just the latest violation by defendants of the duties they owe to shareholders in connection with the Proposed Acquisition, which is the result of a flawed process that was selfishly engineered by defendants largely for their own benefit, at the expense of plaintiff and Crestwood's other public unitholders.  The merger is being driven by interested Company insiders led by Robert G. Phillips ("Phillips"), the Company's Chairman, President and CEO.  The Company's general partner is owned and managed by Crestwood Holdings, a partnership between First Reserve Corporation ("First Reserve"), a private equity firm, and several members of the Company's management team, including Phillips.  At least four of the nine members of the Board of Crestwood GP are controlled by First Reserve.  First Reserve is by far Crestwood's largest unitholder.  Collectively, Crestwood Holdings and First Reserve hold 19,681,194 Crestwood common units and 6,341,707 Class D units, representing together approximately 43.29% of the voting power of Crestwood.

7.     Defendants structured the proposed merger so that it preserves a role for management going forward in the combined company.  Indeed, from the start, and before the parties had agreed on the consideration to be paid to Crestwood's unitholders, Inergy made clear to Phillips that, if he and Crestwood Holdings favored a deal that allowed Inergy to acquire Crestwood on the cheap, he would be rewarded with lucrative employment at Inergy.  And that is exactly what Inergy plans on doing.  Once the transaction closes, Phillips will act as Chairman of

the Board, President and CEO of NRGM GP.  Despite this obvious conflict of interest, the Board permitted Phillips to handle negotiations with Inergy without the presence of an independent, disinterested director.  Other executive officers are also likely to be named as executives at Inergy.  Several of the Individual Defendants may also be appointed directors of Inergy.  The Proposed Acquisition will also enable certain Company insiders, including certain members of senior management, to accelerate and monetize otherwise illiquid equity interests in the Company and secure other material insider benefits, including "golden parachutes."

8.     As if that were not enough, one of the Company's financial advisors, Citigroup, also placed its interests ahead of the Company's unitholders in supporting the proposed merger. Before entering into discussions with Inergy, Crestwood retained Citigroup as its financial advisor in connection with any potential deal.  Citigroup thereafter represented the Company in negotiations with Inergy and its financial advisor, Greenhill & Co. ("Greenhill"), and advised the Crestwood Board on the status of the negotiations until the merger agreement was signed. Although defendants have failed to disclose the amount of fees paid to Citigroup for its work, Citigroup is presumably receiving a substantial sum for its work for Crestwood, some portion of which may be contingent on the closing of the deal.

9.     But the pecuniary benefits flowing to Citigroup out of its involvement in the Proposed Acquisition do not end there: should the Proposed Acquisition close, Citigroup stands to receive additional fees from the Company's proposed acquirer, Inergy.  Citigroup has agreed to refinance up to $600 million in existing debt held by Inergy and Crestwood and allow Inergy to upsize existing term loans from $600 million to $1 billion.  There are also other reasons why Citigroup wants the deal to close.  Less than one year ago, in November 2012, Citigroup, along with J.P. Morgan, agreed to provide $225 million in debt financing to Inergy in connection with Inergy's purchase of Rangeland Energy LLC, an owner of storage and pipeline facilities for oil.

The deal between Inergy and Crestwood increases the likelihood that the $225 million loan is repaid.  (Citigroup also had a substantial preexisting relationship with First Reserve, the Company's largest shareholder.)

10. Aside from the conflicts of interest that permeated the process, the Board failed to conduct a sales process designed to achieve maximum value and instead only negotiated with Inergy.  The Board members did not perform any type of market check before signing the merger agreement.  Moreover, as explained below, the Board signed away any right to perform a market check after the merger agreement was signed, by agreeing to a "non-solicitation" provision which requires them to terminate discussions with other buyers.

11. As detailed below, the Board subjected the Company to a raft of preclusive deal protections, including: (i) a "no-solicitation" clause that precludes the Company from soliciting potential competing bidders; (ii) a matching rights provision that requires the Company to disclose confidential information about competing bids to Inergy within 24 hours and allow Inergy to match any competing proposal within five days of the submission of the superior proposal; and (iii) a termination and expense fee provision that requires the Company to pay Inergy $50.8 million (3.2% of the transaction value) if the Proposed Acquisition is terminated in favor of a superior proposal.  These provisions substantially and improperly limit the Board's ability to act with respect to investigating and pursuing superior proposals and alternatives, particularly in light of the fact that the Company did not contact other buyers prior to entering into the merger agreement.

12. Although Crestwood Holdings controls over 42% of the Company's voting power, the Board also did not secure a provision requiring that a majority of the Company's unaffiliated unitholders approve the deal.  In fact, the Board abandoned its request for such a provision in return for a *de minimus* increase in the already insufficient consideration offered to

shareholders.  Even worse, defendants have entered into a voting agreement with Crestwood Holdings (the "Voting Agreement") pursuant to which, among other things, Crestwood Holdings has agreed to vote all of its limited partner interests and common and class D units in favor of the merger and against any alternative acquisition proposal.  The Voting Agreement and the onerous and preclusive deal protection devices operate conjunctively to make the proposed acquisition a *fait accompli* and ensure that no competing offers will emerge for the Company.  In combination, the Voting Agreement and the deal protection provisions in the Merger Agreement, discussed above, effectively preclude any other potential bidders from consummating an offer for the Company, and make even more egregious the Board's utter failure to obtain the best price possible for unitholders before agreeing to the Proposed Acquisition.

13.     The Proposed Acquisition substantially undervalues the Company.  By agreeing to the unit-and cash-deal, the Board accepted a paltry premium of 14% over the unit's closing price on May 3, 2013.  Indeed, Crestwood's unit price hit $29.03 in July 2012 and $32.16 in December 2011, meaning that many of the Company's unitholders will lose money on the deal. At least one analyst covering the Company, Hilliard Lyons, had recently issued a price target of $35.00 (which was up from $30.00 in its previous report).  Moreover, the Board failed to secure sufficient protection for the Company's unitholders in connection with the risk from movement in unit prices of the Company and Inergy, through a price collar.  Following the announcement of the deal, Inergy's unit price decreased nearly 10%, from $24.55 on May 3, 2013, to $22.66 on June 10, 2013.  As a result, the 14.4% "premium" touted by defendants as justification for the proposed merger has virtually been erased.

14.     In pursuing the unlawful plan to sell the Company for less than fair value and pursuant to an unfair process, defendants have violated federal law, and breached their fiduciary duties of loyalty, due care, independence, candor, good faith and fair dealing, and/or have aided

and abetted such breaches.   Consequently, judicial intervention is warranted here to rectify existing and future irreparable harm to the Company's unitholders.   Plaintiff seeks equitable relief only to enjoin the Proposed Acquisition or, alternatively, rescind the Proposed Acquisition in the event it is consummated.

## JURISDICTION AND VENUE

15.     This Court has jurisdiction over the subject matter of this action pursuant to §27 of the 1934 Act for violations of §§14(a) and 20(a) of the 1934 Act and SEC Rule 14a-9 promulgated thereunder.   This Court has supplemental jurisdiction over the state law claims under 28 U.S.C. §1367.

16.     This Court has jurisdiction over each defendant because each defendant is either a corporation that conducts business in and maintains operations in this judicial district, or is an individual who has sufficient minimum contacts with this judicial district so as to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

17.     Venue is proper within this judicial district pursuant to 28 U.S.C. §1391(b), (c) and (d).   Numerous defendants maintain their offices, have agents, transact business and are found within this judicial district.   Moreover, a substantial part of the events and omissions giving rise to the claims alleged herein arose in part within this judicial district, including the negotiations leading up to the execution of the Merger Agreement.   Finally, defendants inhabit and/or may be found in this judicial district and the interstate trade and commerce described herein are and have been carried out in part within this judicial district.

## PARTIES

18.     Plaintiff Steven Elliot LLC is, and at all times relevant hereto was, a unitholder of Crestwood.

19.     Defendant Crestwood is Delaware master limited partnership with headquarters in Houston, Texas, and is sued herein as an aider and abettor.

20.     Defendant Crestwood GP is a Delaware limited liability company with headquarters in Houston, Texas, and is sued herein as an aider and abettor.  Crestwood GP is the general partner of Crestwood.

21.     Defendant Crestwood Holdings is a Delaware limited liability company with headquarters in Houston, Texas, and is sued herein as an aider and abettor.  Crestwood Holdings is the parent company of Crestwood.

22.     Defendant Inergy L.P. is a Delaware limited partnership with headquarters in Kansas City, Missouri, and is sued herein as an aider and abettor.

23.     Defendant NRGM is a Delaware limited liability company with headquarters in Kansas City, Missouri, and is sued herein as an aider and abettor.  NRGM is general partner of Inergy Midstream.

24.     Defendant Inergy Midstream is a Delaware limited partnership with headquarters in Kansas City, Missouri, and is sued herein as an aider and abettor.  Inergy Midstream is the indirect parent company of NRGM.

25.     Defendant Intrepid Merger Sub, LLC, is a Delaware limited liability company and a wholly-owned subsidiary of Inergy Midstream.  Intrepid is sued herein as an aider and abettor.

26.     Defendant Citigroup is an investment banking firm that provides investment banking services to corporate, institutional, government, and retail clients in connection with, among other things, mergers and acquisitions.  Citigroup also provides financing to, among others, financial buyers in mergers and buyouts.  Citigroup is incorporated and headquartered in New York.  Citigroup is sued herein as an aider and abettor.

27.     Defendant Phillips is Chairman of the Board of Crestwood GP and President and CEO of the Company.  He is and at all times relevant hereto has been a member of the Board.

28.     Defendant Timothy H. Day is and at all times relevant hereto has been a member of the Board.  Day is also a managing director at First Reserve, a private equity firm focused on energy and energy infrastructure development.   First Reserve, along with management at Crestwood, own Crestwood Holdings, which indirectly owns the general partner of Crestwood. First Reserve is Crestwood's largest unitholder.

29.     Defendant Hardy Murchison is and at all times relevant hereto has been a member of the Board.  From 2001 to 2011, Murchison was a Managing Director at First Reserve.

30.     Defendant Michael G. France is and at all times relevant hereto has been a member of the Board.  France is a managing director at First Reserve.

31.     Defendant Joel C. Lambert is and at all times relevant hereto has been a member of the Board.  Lambert is the Vice President of Legal at First Reserve.

32.     Defendant Vanessa Gomez Lagatta is and at all times relevant hereto has been a member of the Board.  Ms. Gomez Lagatta served as the Vice President, Treasurer of Crestwood GP from September 2009 to October 2010, and she currently serves as the Vice President, Treasurer for Quicksilver Resources, Inc.  A majority of Quicksilver Resources, Inc.'s natural gas production from the Fort Worth Basin is gathered and processed by Crestwood.

33.     Defendant Alvin Bledsoe is and at all times relevant hereto has been a member of the Board.

34.     Defendant Philip D. Gettig is and at all times relevant hereto has been a member of the Board.

35.     John W. Somerhalder II is and at all times relevant hereto has been a member of the Board.

36.     The defendants named above in ¶¶27-35 are sometimes collectively referred to herein as the "Individual Defendants."

## DEFENDANTS' FIDUCIARY DUTIES

37.     Under Delaware law and Crestwood GP's Second Amended and Restated Agreement of Limited Partnership, in any situation where the directors of Crestwood undertake a transaction that will result in either: (i) a change in corporate control, or (ii) a breakup of the corporation's assets, the directors have an affirmative fiduciary obligation to obtain the highest value reasonably available for the Company's unitholders, and if such transaction will result in a change of control, the unitholders are entitled to receive a significant premium.  To diligently comply with these duties, the directors and/or officers may not take any action that:

(a)     adversely affects the value provided to the Company's unitholders;

(b)     will discourage or inhibit alternative offers to purchase control of the Company or its assets;

(c)     contractually prohibits them from complying with their fiduciary duties;

(d)     will otherwise adversely affect their duty to search and secure the best value reasonably available under the circumstances for the Company's unitholders; and/or

(e)     will provide the directors and/or officers with preferential treatment at the expense of, or separate from, the public unitholders.

38.     In accordance with their duties of loyalty and good faith, the Individual Defendants, as directors and/or officers of Crestwood, are obligated under Delaware law to refrain from:

(a)     participating in any transaction where the directors' or officers' loyalties are divided;

(b)     participating in any transaction where the directors or officers receive, or are entitled to receive, a personal financial benefit not equally shared by the public unitholders of the corporation; and/or

(c)     unjustly enriching themselves at the expense or to the detriment of the public unitholders.

39.     Plaintiff alleges herein that the Individual Defendants, separately and together, in connection with the Proposed Acquisition, are knowingly or recklessly violating their fiduciary duties, including their duties of loyalty, good faith, and independence owed to plaintiff and other public unitholders of Crestwood.  Defendants stand on both sides of the transaction, are engaging in self-dealing, are obtaining for themselves personal benefits, including personal financial benefits, not shared equally by plaintiff or the Class (as defined below), and are choosing not to provide unitholders with all the information necessary to make an informed decision in connection with the Proposed Acquisition.  As a result of defendants' self-dealing and divided loyalties, neither plaintiff nor the Class will receive adequate or fair value for their Crestwood units in the Proposed Acquisition.

40.     Because the Individual Defendants are knowingly or recklessly breaching their duties of loyalty, good faith and independence in connection with the Proposed Acquisition, the burden of proving the inherent or entire fairness of the Proposed Acquisition, including all aspects of its negotiation, structure, price and terms, is placed upon the Individual Defendants as a matter of law.

**THE PROPOSED ACQUISITION**

41.     Crestwood is a master limited partnership focused on providing midstream infrastructure solutions for the development of North American shale and unconventional resource basins.  Crestwood's operations include natural gas gathering, processing, treating and

compression services for natural gas and natural gas liquids produced from the Barnett Shale in north Texas, the Fayetteville Shale in northwest Arkansas, the Granite Wash area in the Texas Panhandle, the Avalon Shale area of Southeastern New Mexico, the Haynesville/Bossier Shale in western Louisiana, and the Marcellus Shale in northern West Virginia.  Crestwood's general partner is owned and managed by Crestwood Holdings, a partnership between First Reserve Corporation and the Crestwood management team.

42.    On May 6, 2013, Crestwood and Inergy jointly announced that they had entered into the Merger Agreement whereby Inergy would acquire all of Crestwood's outstanding units. The press release announcing the Proposed Acquisition states in pertinent part:

CRESTWOOD AND INERGY TO MERGE FORMING $7 BILLION MIDSTREAM ENERGY PARTNERSHIP

Crestwood Midstream Partners LP (NYSE: CMLP) ("Crestwood Midstream") and Crestwood Holdings LLC ("Crestwood Holdings") (collectively, "Crestwood") and Inergy, L.P. (NYSE:NRGY) ("Inergy L.P.") and Inergy Midstream, L.P. (NYSE:NRGM) ("Inergy Midstream") (collectively, "Inergy") today announced the signing of definitive agreements to create a fully integrated midstream partnership with a total enterprise value of approximately $7 billion.

The combination of Crestwood and Inergy creates a diverse platform of midstream assets providing broad-ranging services in the premier shale plays in North America including the Marcellus Shale, Bakken Shale, Eagle Ford Shale, Permian Basin, Powder River Basin Niobrara Shale, Utica Shale, Barnett Shale, Fayetteville Shale, Granite Wash, Haynesville Shale and Monterey Shale.  The complementary services offered by Crestwood and Inergy create attractive operational and financial synergies.   In addition, enhanced scale and diversification provide further financial flexibility to position the combined partnership to be a formidable competitor for major greenfield development and acquisition opportunities across the midstream value chain.   Further, the combination of a significant portfolio of long-term, fee-based contracts with high-quality customers, coupled with a sizable backlog of organic capital opportunities across multiple geographies, provides meaningful visibility to long-term growth.

Under the terms of the definitive transaction agreements, which have been approved by the boards of directors and independent committees of Crestwood and Inergy, the combination will be implemented through a series of transactions, which will result in Crestwood Holdings acquiring the general partner, and thus control, of Inergy L.P. Crestwood's Chairman, President and Chief Executive Officer, Robert G. Phillips, will lead Inergy L.P. following completion of the

transactions, and will serve as Chairman, President and Chief Executive Officer of the combined company.  Until all of the transactions have closed, Crestwood Midstream and Inergy Midstream will continue to operate as separate, independent companies.

The terms of the agreements are as follows: Crestwood Holdings will acquire the general partner of Inergy L.P. and will contribute the general partner and incentive distribution rights of Crestwood Midstream to Inergy L.P. in exchange for Inergy L.P. common units.  Separately, Crestwood Midstream will be merged with a subsidiary of Inergy Midstream.  In the merger, Crestwood Midstream unitholders will receive 1.070 common units of Inergy Midstream for each unit of Crestwood Midstream they own, representing a 5% premium to the 20-day volume weighted average price ("VWAP") of Crestwood Midstream's common units.  Additionally, all Crestwood Midstream public unitholders other than Crestwood Holdings will receive a one-time cash payment at closing of the merger of approximately $35 million in the aggregate, or $1.03 per unit, $25 million of which will be payable by Inergy Midstream and approximately $10 million of which will be payable by Crestwood Holdings.  Inergy Midstream and Inergy L.P. will continue to be listed on the NYSE under the ticker symbols NRGM and NRGY, respectively.

"We view this transaction as a merger of equals through which we are creating a larger, more diversified operating platform that will be highly attractive to investors, customers, creditors and employees," said Robert G. Phillips, Chairman, President and CEO of Crestwood.  "Crestwood operates a first-class portfolio of shale-focused midstream assets, but our operational capabilities and services to our customers currently end at the tailgate of the processing plant. With this combination, we will truly begin to experience the power of the value chain growth strategy by offering our customers a more comprehensive and competitive suite of services that enables us to capture incremental fee opportunities that expand margins and maximize returns on investment."

"This combination with Crestwood represents Inergy's ongoing and exciting transformation into a pure-play midstream service provider and is accretive to Inergy L.P. and Inergy Midstream unitholders on a per unit basis," said John J. Sherman, Chairman and Chief Executive Officer of Inergy.  "Both of our companies are focused on capitalizing on the rapidly developing U.S. shale plays, and we have been evaluating a number of opportunities to expand our services to gain access to incremental hydrocarbon supply.  Crestwood's reputation and strong competitive position in the gathering and processing, or supply side of the business, greatly complements what we do on the demand side of the business. We believe bringing the two partnerships together through a merger of equals creates a powerful combination that will drive significant value."

*       *       *

**Transaction Details**

The combination of Inergy and Crestwood will be effected through a series of transactions.  In the first transaction, which is expected to close in mid-June, Crestwood Holdings will acquire the general partner of Inergy L.P. for $80 million in cash.  Prior to the closing of this transaction, Inergy L.P. will distribute to its unitholders all of the 56.4 million common units that it owns in Inergy Midstream.  The closing of Crestwood Holdings' acquisition of the general partner of Inergy L.P. is conditioned upon Inergy L.P.'s special distribution of its Inergy Midstream common units to Inergy L.P. unitholders.  Upon closing of this transaction, Crestwood Holdings will own the general partner, and thus control, of Inergy L.P.

In the second transaction, which is cross-conditioned with the transaction above and is expected to close simultaneous with the transaction above, Crestwood Holdings will contribute to Inergy L.P. 100% of its interest in Crestwood Gas Services GP LLC, the general partner of Crestwood Midstream that also owns 100% of the incentive distribution rights of Crestwood Midstream, in exchange for 35.1 million common units and 4.4 million subordinated units of Inergy L.P. Crestwood Holdings has also entered into an agreement that provides that, subject to the closing of the second transaction, Crestwood Holdings will have the option to contribute to Inergy L.P. 7.1 million of the Inergy Midstream common units it receives in the merger described below (or in the event the merger agreement is terminated, 6.7 million Crestwood Midstream Units) in exchange for 14.3 million common units of Inergy L.P., which if exercised would result in it owning approximately 29% of the total common units of Inergy L.P. outstanding.

In the final transaction, which is expected to close in the third calendar quarter of 2013, Crestwood Midstream will be merged into a subsidiary of Inergy Midstream. In the merger, Crestwood Midstream unitholders will receive 1.070 units of Inergy Midstream for each unit of Crestwood Midstream they own, representing a 5% premium to the 20-day VWAP of Crestwood Midstream's units.  Additionally, all Crestwood Midstream public unitholders other than Crestwood Holdings will receive a one-time cash payment at closing of approximately $35 million in the aggregate, or $1.03 per unit, $25 million of which will be payable by Inergy Midstream and approximately $10 million of which will be payable by Crestwood Holdings.  The total consideration received by the Crestwood Midstream public unitholders other than Crestwood Holdings represents a 14% premium relative to Crestwood Midstream's closing price on Friday, May 3, 2013.  The merger is conditioned on the approval of the holders of a majority of the limited partner interests of Crestwood Midstream.  Crestwood Holdings has agreed to vote its limited partner interests in favor of the transaction. The merger is also conditioned on the closing of the first and second transactions described above, but the first and second transactions are not conditioned on the closing of the merger.

Upon closing of the merger, and assuming the election by Crestwood Holdings of its right to contribute Inergy Midstream units to Inergy L.P., ownership of Inergy Midstream L.P. is expected to be as follows:

- Current Crestwood Midstream public unitholders other than Crestwood Holdings will own approximately 24.4%;

- Crestwood Holdings and its affiliates will own approximately 13.7%;

- Current Inergy Midstream public unitholders will own approximately 19.4%;

- Current Inergy L.P. public unitholders will own approximately 29.9%;

- Inergy L.P. will own approximately 4.7%; and

- Current management of Inergy will own approximately 7.9%.

Upon closing of the merger, and assuming the election by Crestwood Holdings of its right to contribute Inergy Midstream units to Inergy L.P., ownership of Inergy L.P. is expected to be as follows:

- Current Inergy L.P. public unitholders will own approximately 56.4%;

- Crestwood Holdings and its affiliates will own approximately 29.0%; and

- Current management of Inergy will own approximately 14.6%.

Together, Crestwood Holdings, Crestwood management and Inergy management teams are expected to hold units of the combined company valued in excess of $1.5 billion, highlighting the management team's close alignment of interests with fellow unitholders.

**Headquarters and Management**

The name of the combined company will be decided as the companies move closer to finalizing the transaction. Following the close of the transaction, the combined partnership will be headquartered in Houston, Texas with executive offices in Kansas City, Missouri and Fort Worth, Texas.

Robert G. Phillips will act as Chairman, President and Chief Executive Officer of the combined company. The executive management team, which is expected to include senior executives from both companies, will be announced upon completion of the merger. The combined companies' newly constituted Boards of Directors will include representatives from both Crestwood and Inergy. Upon closing, Inergy Chairman and CEO, John J. Sherman and President, R. Brooks Sherman, Jr., will step down from day-to-day management roles at the new partnership; however, both John J. Sherman and R. Brooks Sherman have elected to maintain 100% of their meaningful personal investment in the pro forma partnership. Additionally, John J. Sherman will continue to serve as a director on both the board of Inergy L.P. as well as the board of Inergy Midstream.

**Advisors**

Citigroup Global Markets Inc. acted as exclusive financial advisor to Crestwood, and Simpson Thacher & Bartlett LLP and Akin Gump Strauss Hauer & Feld LLP acted as legal counsel to Crestwood.  Evercore Partners served as exclusive financial advisor to the Conflicts Committee of the Crestwood Midstream Board of Directors, and Morris, Nichols, Arsht & Tunnell LLP served as legal counsel to the Conflicts Committee of the Crestwood Midstream Board of Directors. Greenhill & Co. served as lead financial advisor and Jefferies LLC served as co-financial advisor and sole technical advisor for Inergy L.P. and Inergy Midstream. Vinson & Elkins LLP acted as legal counsel to Inergy L.P. and Inergy Midstream. SunTrust Robinson Humphrey, Inc. acted as financial advisor to a committee of independent directors of the Inergy L.P. Board of Directors, and Richards, Layton & Finger, P.A. served as legal counsel to the committee.  Tudor Pickering Holt & Co. served as financial advisor to a committee of independent directors of the Inergy Midstream Board of Directors, and Potter Anderson & Corroon LLP served as legal counsel to the committee.

43.     The events that led to the proposed merger began in mid-January 2013, when Greenhill, Inergy's financial advisor, contacted representatives of First Reserve management to gauge their interest in pursuing a strategic transaction.  Greenhill later provided First Reserve an indicative structure chart outlining a series of potential transactions involving Crestwood and Inergy, and requested that representatives of First Reserve and Crestwood attend a meeting in Houston, Texas on February 12, 2013.

44.     On February 12, 2013, representatives of Greenhill met with representatives of Crestwood and First Reserve.  Thereafter, Phillips notified the remaining members of the Board, including Crestwood Conflicts Committee, of Inergy's interest.

45.     The Board was apparently interested.  It promptly retained Citigroup as its financial advisor.  On February 25, 2013, Crestwood delivered to Greenhill a letter outlining Crestwood's non-binding indication of interest in response to the process letter.  The indication of interest proposed a merger of Crestwood and Inergy Midstream, a consolidation of both entities' general partner interests and incentive distribution rights at Inergy and the acquisition of the general partner of Inergy by Crestwood Holdings and outlined structural alternatives for

effecting the transactions.  Crestwood also proposed that its management team would run the combined business.

46.      Over the next few weeks, representatives of Greenhill and Citigroup discussed Crestwood's indication of interest, including on February 27 and 28, 2013 and March 9, 2013. In addition, the Chairman, CEO and President of Inergy John J. Sherman ("Sherman") met with Phillips.  No members of the Conflicts Committee participated in these discussions and/or meetings.

47.      On March 12, 2013, Greenhill sent to Crestwood a summary of preliminary transaction terms.  The summary contemplated, among other things, that Inergy would acquire the general partner interest and incentive distribution rights in Crestwood in exchange for Inergy common units, and that Phillips would serve as Chairman, President and CEO of Inergy following the proposed transaction.  The summary also left open the possibility that the Board of Directors at the post-merger company would include members from the Crestwood Board of Directors.

48.      Despite the fact that Crestwood had established a Conflicts Committee in 2011, which, according to its charter, was designed to "review specific matters that the Board submits to the Committee because the Board believes such matters may involve conflicts of interest," the Board did not at this point empower the Conflicts Committee to oversee and handle negotiations or otherwise take steps to ensure that unitholders' interests were being protected during negotiations between Inergy and Crestwood.  Instead, the Board allowed Phillips and his management team to freely interact and negotiate with Inergy.  Nor did the Board decide to conduct a pre-signing market check or even identify other potential strategic partners.  No effort was ever made by the Board to open the process up to other partners, or to let it be known that Crestwood was considering its strategic options.

49.     Both parties continued to exchange proposals.   During the next few weeks, representatives of Crestwood and Inergy and their respective financial advisors had additional conversations regarding the terms and the structure of the proposed transaction, including whether the amount of Inergy common units to be issued to Crestwood Holdings.   Again, no members of the Conflicts Committee participated in these discussions.

50.     On April 5, 2013, as the parties were nearing a deal, the Board finally acknowledged the multiple conflicts of interest stemming from the parties' merger discussions and the structure contemplated by the proposed deal.   It decided that the Conflicts Committee should be asked to evaluate the proposed deal.   The Conflicts Committee thereafter hired Evercore Partners ("Evercore") as its financial advisor.

51.     Inexplicably, however, the Conflicts Committee continued to permit Phillips (and Citigroup) to negotiate the terms of the deal without any participation by members of the Conflicts Committee or its advisors.   According to the S-4, Phillips was still handling the "key issues raised by the first drafts of the [merger agreement]."

52.     On April 11, 2013, representatives of Crestwood, First Reserve, Inergy, Citigroup and Greenhill met in Kansas City.   On April 21, 2013, Greenhill contacted Phillips to discuss key issues raised by the first drafts of the definitive documentation.   On April 22, 2013, Phillips and Sherman discussed the prospects for a combined business.   On April 23, 2013, Sherman met with Phillips and a representative of First Reserve to discuss First Reserve's view of the combined business.   No members of the Conflicts Committee participated in these discussions.   Instead, the Conflicts Committee was updated about the status of discussions on the terms of the merger agreement by Phillips.

53.     On April 24, 2013, after receiving an update from Phillips, the Conflicts Committee apparently became concerned with the course of the negotiations.   The Conflicts

Committee instructed its advisor, Evercore, to reach out to Crestwood management to see if they could improve the terms of the Proposed Acquisition.  In particular, the Conflicts Committee sought an increase in the consideration offered to the unitholders unaffiliated with Crestwood Holdings, and sought a "majority of the minority" provision which would allow unitholders other than those affiliated with Crestwood Holdings to have a meaningful vote on the Proposed Acquisition.

54.     Phillips, however, immediately attempted to convince the Conflicts Committee that this request was not a good idea.  Phillips told the Conflicts Committee "that a request for additional cash consideration beyond the $25 million total amount contemplated as being paid by Inergy Midstream to the Crestwood unitholders would not be supported by Crestwood Holdings."  He further stated "that he did not believe that it would be feasible to request that the proposed merger be submitted for approval by a majority of the units held by the unitholders other than the Crestwood Affiliated Entities given the advanced stage of the negotiations with Inergy Midstream and Inergy Midstream's focus on ensuring deal certainty."  Thus, rather than fight for the interests of unitholders, as he was required to do by his fiduciary duties, Phillips was looking out for his interests and the interests of Crestwood Holdings (in which he is an investor). While the Conflicts Committee was able to secure an additional $10 million for unitholders (an increase of .5% of the consideration to unitholders), the Conflicts Committee abandoned its request for a "majority of the minority" provision, and then allowed Inergy to enter into a voting agreement with Crestwood Holdings which locks up 42% of the voting units.

55.     Over the next two weeks, the parties finalized the terms of the merger agreement.

56.     On May 5, 2013, the Board approved the Merger Agreement.  Defendants announced the deal the next day.

57.     In pursuing the unlawful plan to sell the Company for less than fair value and pursuant to an unfair process, defendants have breached their fiduciary duties of loyalty, due care, independence, candor, good faith and fair dealing, and/or have aided and abetted such breaches. Moreover, the deal protection devices and the Voting Agreement collectively operate to block any other potential acquirers, rendering unlikely any alternative proposals to acquire Crestwood.  Consequently, judicial intervention is warranted here to rectify existing and future irreparable harm to the Company's unitholders.  Plaintiff seeks equitable relief only to enjoin the Proposed Acquisition or, alternatively, rescind the Proposed Acquisition in the event it is consummated.

## THE FALSE AND MISLEADING PROXY

58.     In an attempt to secure unitholder support for the unfair Proposed Acquisition, on May 29, 2013, defendants issued the materially false and misleading S-4 to Crestwood unitholders.  The S-4, which recommends that Crestwood unitholders vote in favor of the Proposed Acquisition, omits and/or misrepresents material information about the process leading up to the Merger Agreement, the unfair consideration offered in the Proposed Acquisition and the actual intrinsic value of the Company's assets both as a standalone entity and as a merger partner for Inergy.  Specifically, the S-4 omits and/or misrepresents the material information set forth below in contravention of §§14(a) and 20(a) of the 1934 Act.

**The Events Leading to the Merger Agreement**

59.     The S-4 fails to provide shareholders with material information regarding the events leading to the merger agreement, including, in particular, the following:

(a)     ***All strategic alternatives considered by the Company, including the nature and financial viability of those alternatives and their intrinsic value on a stand-alone basis***.  The S-4 states on page 49 that management of Crestwood regularly reviews opportunities

to explore unitholder value.  However, the S-4 does not disclose whether the Board or its advisors conducted any analysis of those alternatives and their financial impact on the Company. This information is material because unitholders are entitled to know why the Board preferred the Proposed Acquisition over other alternatives, as well as the nature and financial viability of those other alternatives.  Unitholders are also entitled to know whether the Board was informed prior to entering into the Proposed Acquisition.

        (b)    ***The terms of the February 25, 2013 Crestwood indication of interest***. On page 50, the S-4 states that, in response to a solicitation by Greenhill, Inergy's financial advisor, Crestwood delivered to Greenhill a letter outlining Crestwood's indication of interest. However, the S-4 does not disclose any details of the indication of interest submitted by Crestwood, including the structure and price of the proposed deal (if any).  Unitholders are entitled to be informed of the events leading up to the decision to enter into the Proposed Acquisition.

        (c)    ***Whether any members of the Crestwood Conflicts Committee participated in the various meetings between Crestwood and Inergy***.  The S-4 states that representatives of Crestwood, including Phillips, met or spoke with representatives of Inergy on February 12, March 6, 15, and 21, 2013; April 1, 4, 11, and 21, 2013; and May 4, 2013, to discuss the proposed terms of the transaction.  However, the S-4 does not state whether any Board members besides Phillips (or those affiliated with First Reserve) participated in the meetings or oversaw the negotiations.  Unitholders are entitled to know whether the Board members fulfilled their fiduciary duty of due care, which includes to overseeing the merger process.  This information is also material because unitholders are entitled to know whether individuals with interests divergent from unitholders were responsible for negotiating with

potential buyers in those meetings (and thus, whether the negotiations were truly at arm's length).

(d)  ***Why the Board did not contact other buyers or otherwise perform a market check before entering into the Proposed Acquisition***.  The S-4 does not explain whether the Board identified or contacted any other potentially interested parties.  If the Board did not contact other parties, the S-4 fails to explain why it did not.  The omission of this information renders the S-4 materially misleading because the Board has a duty to secure the best possible price for the Company's units, and unitholders are entitled to full and fair disclosure of the Board's efforts, or lack thereof, to do so.

(e)  ***Whether the Board considered and/or sought to protect the offered merger consideration through a price collar***.  The S-4 discusses the consideration in the form of Inergy common units, but does not disclose any Board discussions about a collar for the Inergy units to ensure it did not drop significantly in value after the Proposed Acquisition was announced.  This information is material to unitholders because a collar provision would protect Crestwood unitholders from Inergy's unit price, which recently dropped.  Because the exchange ratio is fixed, a decrease in Inergy's unit price following the announcement of the proposed merger has pushed down the value offered to Crestwood unitholders and virtually eliminated the "premium" touted by defendants.

**Conflicts of Interest**

60.  The S-4 fails to disclose material facts concerning the interests of the various parties responsible for negotiating the Proposed Acquisition.  Specifically, this information includes:

(a)  ***The nature of the post-merger employment discussions between Phillips and Inergy***.  On pages 50 and 51, the S-4 states that Greenhill sent to Crestwood a summary of

preliminary transaction terms, which provided that "Mr. Phillips would serve as Chairman, President and Chief Executive Officer of Inergy following the proposed transaction."  The S-4 also states that Phillips and Inergy continued to discuss Inergy's proposal at various meetings over the next few months.  However, the S-4 does not disclose the nature of the discussions between Phillips (as well as any other senior management at Crestwood) regarding their employment after the merger.  Unitholders are entitled to know of all potential and actual conflicts of interests that may have corrupted the sales process.

      (b)    ***Whether (and if so, when) Inergy and Crestwood discussed post-merger employment for defendants as well as Crestwood's executives other than Phillips***.  The omission of this information renders the S-4 materially misleading because Company unitholders must be told of all potential and actual conflicts of interests that bear on an advisor's ability to objectively assess the value of merger transactions.

      (c)    ***The specific services Citigroup has provided to any of the parties involved in the Proposed Acquisition, or any of their affiliates, in the last two years, and the total amount of compensation received for such services***.  Page 50 of the S-4 states that Crestwood retained Citigroup as its financial advisor, and that representatives of Citigroup met with representatives of Inergy throughout the process.  However, the S-4 does not disclose the fees paid to Citigroup for its work in connection with the proposed merger.  Nor does it disclose any information regarding Citigroup's prior work for the parties involved in the transaction, including: (i) the details concerning Citigroup's agreement to provide debt refinancing to Inergy in connection with the proposed merger, including the amount of fees Citigroup may receive for those services; (ii) the fees received by Citigroup in return for its agreement in November 2012 to provide $225 million debt financing to Inergy in connection with Inergy's purchase of Rangeland Energy LLC; (iii) the fees received by Citigroup in October 2012 when it served as an

underwriter for a $429 million initial public offering by PBF Energy, a company which is owned by Blackstone and First Reserve; and (iv) the fees received by Citigroup in March 2013 when it acted a joint book-runner for a public offering of 4.5 million common units of Crestwood. Crestwood's unitholders are entitled to know of all potential and actual conflicts of interests that may have burdened the Board's financial advisor or otherwise corrupted the sales process.

(d)    *Whether (and if so, when) the Board was aware of Citigroup's agreement to provide refinancing to Inergy in connection with the deal*.  Page 50 of the S-4 states that Crestwood retained Citigroup as its financial advisor, and that representatives of Citigroup met with representatives of Inergy throughout the process.  Unitholders are entitled to know whether the Board unreasonably relied on a financial advisor who had an interest in ensuring the deal got done, rather than ensuring that the Board, which owed fiduciary duties to the Company's unitholders, got fair, impartial advice.

**The Analyses Conducted by the Financial Advisors for Crestwood and Inergy**

61.    The S-4 fails to disclose material information, including certain data and inputs, supporting the analyses conducted by the financial advisors for Crestwood (Citigroup and Evercore) and Inergy (Greenhill), including:

(a)    *Citigroup's analysis of the proposed merger*.  Page 50 of the S-4 states that Crestwood retained Citigroup as its financial advisor, and that representatives of Citigroup met with the financial advisor for Inergy on March 4, 2013 to discuss the deal.  However, the S-4 does not disclose whether Citigroup provided any financial analyses for the Board.  Nor does the S-4 disclose any of Citigroup's analysis of the value of the Company, the value of Inergy, the value of the various proposals between the companies, and/or the fairness of the deal to unitholders.  When voting on a proposed transaction, unitholders are also entitled to know whether the consideration offered in a merger is fair.

(b)     *The financial projections provided by Crestwood and Inergy Midstream management and relied upon by Evercore for purposes of its analysis, for fiscal years 2013-2017, for the following items: (i) revenue; (ii) depreciation and amortization; (iii) changes in net working capital; (iv) any additional line items used to derive unlevered free cash flow; and (v) unlevered free cash flow*.  The S-4 states that management of Crestwood and Inergy provided Evercore with financial projections.  However, the S-4 fails to disclose certain of those projections to Company unitholders.  Defendants' failure to disclose this information renders the S-4 false and misleading because Crestwood unitholders are entitled to be informed of management's best estimates of the Company's future cash flows, especially when the projections form the bases for the analyses offered by the Board's financial advisors and the value assumptions presented to the buyer, Inergy.

(c)     *With respect to Evercore's Discounted Cash Flow Analysis for Crestwood: (i) the definition of unlevered free cash flow used by Evercore; (ii) the inputs and assumptions used by Evercore to derive the discount rate range (7.5% to 8.5%); (iii) the implied perpetuity growth rates derived by Evercore using the terminal EBITDA multiple methodology; (iv) the implied terminal EBITDA multiples derived by Evercore using the perpetuity growth rate methodology; (v) the implied per unit value ranges derived by Evercore using the terminal EBITDA methodology and the perpetuity growth rate methodology individually; (vi) the basis on which Evercore derived the range of terminal exit yields; and (vii) the implied per unit value ranges derived by Evercore in its distributions DCF Analyses using the CAPM discount rate range and the total market return methodology individually*.  The S-4 states on page 64 that Evercore performed a discounted cash flow analysis to derive an implied per unit value range for the Crestwood common units.  However, the S-4 fails to provide the inputs listed above.  These omissions render the S-4 materially misleading because they have

a significant impact on the outcome of the Discounted Cash Flow analysis. Unitholders are entitled to know these inputs so that they can determine if they are appropriate, and if not, select their own to arrive a value of the Company. Without disclosure of these inputs into Evercore's Discounted Cash Flow analysis, unitholders cannot determine if the outcome of Evercore's Discounted Cash Flow analysis is an adequate measure of the Company's intrinsic value, and thus do not have the information necessary to make a competent decision as to whether to vote in favor of the Proposed Acquisition.

(d)      *With respect to Evercore's Precedent M&A Transactions Analysis for Crestwood, the following items for each of the precedent transactions selected by Evercore: (i) announced date; (ii) target company; (iii) acquiring company; (iv) transaction value; (v) transaction value / LTM EBITDA; (vi) transaction value / NTM EBITDA; and (vii) any other observed multiples or benchmarking statistics*. The S-4 states that Evercore, in conducting its analysis, selected transactions since 2010 which it deemed to have characteristics similar to those of Crestwood, but it does not disclose the individual multiples observed for each of the selected transactions. The omission of this information is material because without the individually observed multiples, unitholders do not have the information to determine how the selected transactions actually compare to the offer by Inergy, and thus are unable to assess whether Evercore has adequately compared the proposed transaction to the selected transactions.

(e)      *With respect to Evercore's Precedent M&A Transactions Analysis for Crestwood, the implied per unit value ranges derived by Evercore using Crestwood's 2013E EBITDA and 2014E EBITDA, individually*. The S-4 states that Evercore applied a range of selected multiples to estimated 2013 EBITDA and 2014 EBITDA, which resulted in implied equity value ranges for Crestwood, but it does not provide the implied per value ranges using estimated 2013 EBITDA and 2014 EBITDA individually. The omission of this information is

material because without these implied value ranges, unitholders do not have the information to determine how the selected transactions actually compare to the offer by Inergy, and thus are unable to assess whether Evercore has adequately compared the proposed transaction to the selected transactions.

(f)      *With respect to Evercore's Peer Group Trading Analysis for Crestwood, the following multiples for each of the comparable companies selected by Evercore: (i) Enterprise Value / 2013E EBITDA; and (ii) Enterprise Value / 2014E EBITDA*.  The S-4 sets forth a summary of Evercore's Peer Group Trading Analysis, but it fails to disclose two key multiples for that analysis.  The Peer Group Trading Analysis is derived by selecting comparable companies and then applying the key multiples for those companies to similar multiples at Crestwood.  Without these multiples, unitholders are unable to independently assess whether the companies selected by Evercore are comparable to the Company (as well whether Evercore made any adjustments before applying the multiples to the Company) and its performance.

(g)      *With respect to Evercore's Peer Group Trading Analysis for Crestwood, whether Evercore conducted any kind of benchmarking analysis for Crestwood, in relation to the selected comparable companies*.  This information is material to a unitholder's decision on whether the consideration offered by Inergy is fair.  Without this information, unitholders are unable to determine whether Evercore examined the key financial statistics and ratios for Crestwood and its comparables and, if so, whether Evercore placed a greater (or lesser) value on any of the comparable companies for purposes of its valuation analysis.  This information will allow a unitholder to independently assess whether Evercore improperly adjusted the value of Crestwood downward.

(h)      *With respect to Evercore's Peer Group Trading Analysis for Crestwood, the implied per unit value ranges derived by Evercore using Crestwood's 2013E EBITDA and*

***2014E EBITDA, individually***.  The S-4 states that Evercore, in conducting its analysis, calculated and analyzed enterprise value to estimated 2013 and 2014 EBITDA for the comparable companies and Crestwood.  The omission of this information is material because without these implied value ranges, unitholders do not have the information necessary to determine how the selected companies actually compare to Crestwood, and thus are unable to assess whether Evercore has adequately compared the Company's transaction performance to its selected transactions.

(i)    ***With respect to Evercore's Discounted Cash Flow Analysis for Inergy Midstream: (i) the definition of unlevered free cash flow used by Evercore; (ii) the inputs and assumptions used by Evercore to derive the discount rate range (6.5% to 7.5%); (iii) the implied perpetuity growth rates derived by Evercore using the terminal EBITDA multiple methodology; (iv) the implied terminal EBITDA multiples derived by Evercore using the perpetuity growth rate methodology; (v) the implied per unit value ranges derived by Evercore using the terminal EBITDA methodology and the perpetuity growth rate methodology individually; (vi) the basis on which Evercore derived the range of terminal exit yields; (vii) the implied per unit value ranges derived by Evercore using the CAPM discount rate range and the total market return methodology individually; and (viii) Inergy Midstream's EBITDA, unlevered free cash flow and distribution per limited partner unit as of December 31, 2017***.  The S-4 states on page 66 that Evercore performed a discounted cash flow analysis to derive an implied per unit value range for the Inergy Midstream common units.  However, the S-4 fails to provide the inputs listed above.  These omissions render the S-4 materially misleading because they have a significant impact on the outcome of the Discounted Cash Flow Analysis.  Unitholders are entitled to know the basis for the selection of these inputs so that they can determine if they are appropriate, and if not, select their own to arrive a value of Inergy

Midstream. Without disclosure of these inputs into Evercore's Discounted Cash Flow Analysis, unitholders cannot determine if the outcome of Evercore's Discounted Cash Flow Analysis is an appropriate measure of Inergy Midstream, and thus do not have the information necessary to make a competent decision whether to vote in favor of the Proposed Acquisition.

(j)       **With respect to Evercore's Precedent M&A Transaction Analysis for Inergy Midstream, the following information for each of the precedent M&A transactions selected by Evercore: (i) announced date; (ii) target company; (iii) acquiring company; (iv) transaction value; (v) transaction value / LTM EBITDA; (vi) transaction value / NTM EBITDA; and (vii) any other observed multiples or benchmarking statistics**.  The S-4 on page 67 states that Evercore, in conducting its analysis, selected transactions since 2000 which it deemed to have characteristics similar to those of Inergy Midstream, but it does not disclose the individual multiples observed for each of the selected transactions.  The omission of this information is material because without the individually observed multiples, unitholders do not have the information to determine how the selected transactions actually compare to the offer by Inergy, and thus are unable to assess whether Evercore has adequately compared the Company's transaction performance to its selected transactions.

(k)       **With respect to Evercore's Precedent M&A Transaction Analysis for Inergy Midstream, the implied per unit value ranges derived by Evercore using Inergy Midstream's 2013E EBITDA and 2014E EBITDA, individually**.  The S-4 states that Evercore, in conducting its analysis, calculated and analyzed enterprise value to estimated 2013 and 2014 EBITDA for the comparable companies and Inergy Midstream.  The omission of this information is material because without these implied value ranges, unitholders do not have the information to determine how the selected transactions actually compare to Inergy Midstream,

and thus are unable to assess whether Evercore has adequately compared the offer to the selected transactions.

(l) **With respect to Evercore's Peer Group Trading Analysis for Inergy Midstream, the following multiples for each of the comparable companies selected by Evercore: (i) Enterprise Value / 2013E EBITDA; and (ii) Enterprise Value / 2014E EBITDA.** The S-4 sets forth a summary of Evercore's Peer Group Trading Analysis, but it fails to disclose two of the key inputs for that analysis.  The omission of the multiples is material because the value implied by the Peer Group Trading Analysis is derived by selecting comparable companies and then applying the key metrics for those companies to similar metrics at Inergy Midstream.  Without this information, unitholders are unable to independently assess whether the companies selected by Evercore are comparable to Inergy (as well whether Evercore made any adjustments before applying the multiples to Inergy).

(m) **With respect to Evercore's Peer Group Trading Analysis for Inergy Midstream, whether Evercore conducted any kind of benchmarking analysis for Inergy Midstream, in relation to the selected comparable companies**.  This information is material to a unitholder's decision on whether the consideration offered by Inergy is fair.  Without this information, unitholders are unable to determine whether Evercore examined the key financial statistics and ratios for Inergy and its comparables and, if so, whether Evercore placed a greater (or lesser) value on any of the comparable companies for purposes of its valuation analysis.  This information will allow a unitholder to independently assess whether Evercore improperly adjusted the value of Inergy upward.

(n) **With respect to Evercore's Peer Group Trading Analysis for Inergy Midstream, the implied per unit value ranges derived by Evercore using Inergy Midstream's 2013E EBITDA and 2014E EBITDA, individually**.  The S-4 states that Evercore applied a

range of selected multiples to estimated 2013 EBITDA and 2014 EBITDA, which resulted in implied equity value ranges for Inergy, but it does not provide the implied per value ranges using estimated 2013 EBITDA and 2014 EBITDA individually.  The omission of this information is material because without these implied value ranges, unitholders do not have the information to determine how the selected transactions actually compare to the offer by Inergy, and thus are unable to assess whether Evercore has adequately compared the Company's transaction performance to its selected transactions.

## CLASS ACTION ALLEGATIONS

62.    Plaintiff brings this action individually and as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all holders of Crestwood common units who are being and will be harmed by defendants' actions described herein (the "Class").  Excluded from the Class are defendants herein and any person, firm, trust, corporation, or other entity related to or affiliated with any defendants.

63.    This action is properly maintainable as a class action.

64.    The Class is so numerous that joinder of all members is impracticable.  According to the S-4, 53.76 million Crestwood common units are outstanding.  These units are held by hundreds, if not thousands, of beneficial holders.

65.    There are questions of law and fact which are common to the Class and which predominate over questions affecting any individual Class member.  The common questions include, *inter alia*, the following:

(a)    whether the Individual Defendants have breached their fiduciary duties of undivided loyalty, independence, or due care with respect to plaintiff and the other members of the Class in connection with the Proposed Acquisition;

(b)      whether the defendants are engaging in self-dealing in connection with the Proposed Acquisition;

(c)      whether the Individual Defendants have breached their fiduciary duty to secure and obtain the best value reasonable under the circumstances for the benefit of plaintiff and the other members of the Class in connection with the Proposed Acquisition;

(d)      whether the defendants are unjustly enriching themselves and other insiders or affiliates of Crestwood;

(e)      whether the Individual Defendants have breached any of their other fiduciary duties to plaintiff and the other members of the Class in connection with the Proposed Acquisition, including the duties of good faith, diligence, candor and fair dealing;

(f)      whether the defendants, in bad faith and for improper motives, have impeded or erected barriers to discourage other strategic alternatives, including other offers for the Company or its assets;

(g)      whether the Proposed Acquisition compensation payable to plaintiff and the Class is unfair and inadequate; and

(h)      whether plaintiff and the other members of the Class would be irreparably harmed were the transactions complained of herein consummated.

66.      Plaintiff's claims are typical of the claims of the other members of the Class and plaintiff does not have any interests adverse to the Class.

67.      Plaintiff is an adequate representative of the Class, has retained competent counsel experienced in litigation of this nature, and will fairly and adequately protect the interests of the Class.

68.     The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class which would establish incompatible standards of conduct for the party opposing the Class.

69.     Plaintiff anticipates that there will be no difficulty in the management of this litigation.   A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

70.     Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole.

## COUNT I

### Breach of Fiduciary Duties Against the Individual Defendants

71.     Plaintiff repeats and realleges each allegation set forth herein.

72.     The Individual Defendants have knowingly and recklessly and in bad faith violated their fiduciary duties of care, loyalty, candor, good faith and independence owed to the public unitholders of Crestwood and have acted to put their personal interests ahead of the interests of Crestwood's unitholders.

73.     By the acts, transactions and courses of conduct alleged herein, defendants, individually and acting as a part of a common plan, knowingly and recklessly and in bad faith are attempting to unfairly deprive plaintiff and other members of the Class of the true value of their investment in Crestwood units.

74.     The Individual Defendants have knowingly and recklessly and in bad faith violated their fiduciary duties by entering into the Proposed Acquisition without regard to the fairness of the transaction to Crestwood's unitholders.

75.     As demonstrated by the allegations above, the Individual Defendants knowingly or recklessly failed to exercise the care required, and breached their duties of loyalty, good faith, candor and independence owed to the unitholders of Crestwood because, among other reasons, they failed to:

(a)     ensure a fair process;

(b)     fully inform themselves of the market value of Crestwood before entering into the Proposed Acquisition;

(c)     act in the best interests of the public unitholders of Crestwood;

(d)     maximize unitholder value;

(e)     obtain the best financial and other terms when the Company's independent existence will be materially altered by the Proposed Acquisition; and

(f)     act in accordance with their fundamental duties of good faith, due care and loyalty.

76.     Because the Individual Defendants dominate and control the business and corporate affairs of Crestwood, and are in possession of private corporate information concerning Crestwood's assets, business and future prospects, there exists an imbalance and disparity of knowledge and economic power between them and the public unitholders of Crestwood which makes it inherently unfair for them to pursue any proposed transaction wherein they will reap disproportionate benefits to the exclusion of maximizing unitholder value.

77.     By reason of the foregoing acts, practices and course of conduct, the Individual Defendants have knowingly and recklessly and in bad faith failed to exercise ordinary care and diligence in the exercise of their fiduciary obligations toward plaintiff and the other members of the Class.

78.     As a result of the actions of defendants, plaintiff and the Class have been and will be irreparably harmed.

79.     Unless the Proposed Acquisition is enjoined by the Court, defendants will continue to breach their fiduciary duties owed to plaintiff and the other members of the Class, will not engage in arm's-length negotiations on the Proposed Acquisition's terms, and will not supply to Crestwood's unitholders sufficient information to enable them to make informed decisions regarding the tender of their units in connection with the Proposed Acquisition, and may consummate the Proposed Acquisition, all to the irreparable harm of the members of the Class.

80.     Plaintiff and the other members of the Class have no adequate remedy at law. Only through the exercise of this Court's equitable powers can plaintiff and the Class be fully protected from the immediate and irreparable injury which defendants' actions threaten to inflict.

### COUNT II

**Aiding and Abetting the Individual Defendants' Breaches of Fiduciary Duty
Against Crestwood, Crestwood GP, Crestwood Holdings, Inergy L.P., NRGM, Inergy
Midstream, Intrepid Merger Sub, LLC and Citigroup**

81.     Plaintiff repeats and realleges each allegation set forth herein.

82.     Defendants Crestwood, Crestwood GP, Crestwood Holdings, Inergy L.P., NRGM, Inergy Midstream, Intrepid Merger Sub, LLC and Citigroup are sued herein as an aiders and abettors of the breaches of fiduciary duty outlined above by the Individual Defendants.

83.     The Individual Defendants breached their fiduciary duties of loyalty, care, candor and good faith and fair dealing to the Crestwood unitholders.

84.     Such breaches of fiduciary duties could not and would not have occurred but for the conduct of defendants Crestwood, Crestwood GP, Crestwood Holdings, Inergy L.P., NRGM,

Inergy Midstream, Intrepid Merger Sub, LLC and Citigroup in aiding and abetting such breaches.

85.    Defendants Crestwood, Crestwood GP, Crestwood Holdings, Inergy L.P., NRGM, Inergy Midstream, Intrepid Merger Sub, LLC and Citigroup had knowledge that they were aiding and abetting the Individual Defendants' breaches of their fiduciary duties to Crestwood unitholders, and thus knowingly participated in such breaches.

86.    Defendants Crestwood, Crestwood GP, Crestwood Holdings, Inergy L.P., NRGM, Inergy Midstream, Intrepid Merger Sub, LLC and Citigroup provided substantial assistance to the Individual Defendants in the breach of their fiduciary duties owed to Crestwood unitholders.

87.    As a result of defendants Crestwood's, Crestwood GP's, Crestwood Holdings', Inergy L.P.'s, NRGM's, Inergy Midstream's, Intrepid Merger Sub, LLC's and Citigroup's aiding and abetting the Individual Defendants' breaches of fiduciary duties, plaintiff and the other members of the Class were damaged in that they were prevented from obtaining a fair price for their units.

88.    Plaintiff and the Class have no adequate remedy at law.  Only through the exercise of this Court's equitable powers can plaintiff and the Class be fully protected from the immediate and irreparable injury which defendants' actions threaten to inflict.

**COUNT III**

**Against the Individual Defendants and Crestwood for**
**Violations of §14(a) of the 1934 Act and SEC Rule 14a-9 Promulgated Thereunder**

89.    Plaintiff repeats and realleges each allegation set forth herein.

90.    During the relevant period, the Individual Defendants and Crestwood disseminated the false and misleading S-4 specified above, which failed to disclose material facts

necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

91.     The S-4 was prepared, reviewed and/or disseminated by the Individual Defendants and Crestwood.  It misrepresented and/or omitted material facts, including material information about the unfair sales process for the Company, the unfair consideration offered in the Proposed Acquisition, and the actual intrinsic value of the Company's assets.

92.     In so doing, the Individual Defendants and Crestwood made untrue statements of material facts and omitted to state material facts necessary to make the statements that were made not misleading in violation of §14(a) of the 1934 Act and SEC Rule 14a-9 promulgated thereunder.  By virtue of their positions within the Company, the Individual Defendants and Crestwood were aware of this information and of their duty to disclose this information in the S-4.

93.     The Individual Defendants and Crestwood were at least negligent in filing the S-4 with these materially false and misleading statements.

94.     The omissions and false and misleading statements in the S-4 are material in that a reasonable unitholder would consider them important in deciding how to vote on the Proposed Acquisition.  In addition, a reasonable investor would view a full and accurate disclosure as significantly altering the "total mix" of information made available in the S-4 and in other information reasonably available to unitholders.

95.     By reason of the foregoing, the Individual Defendants and Crestwood have violated §14(a) of the 1934 Act and SEC Rule 14a-9 promulgated thereunder.

96.     Because of the false and misleading statements in the S-4, plaintiff is threatened with irreparable harm, rendering money damages inadequate.  Therefore, injunctive relief is appropriate to ensure defendants' misconduct is corrected.

## COUNT IV

### Against the Individual Defendants and Crestwood for
### Violation of §20(a) of the 1934 Act

97.      Plaintiff repeats and realleges each allegation set forth herein.

98.      The Individual Defendants acted as controlling persons of Crestwood within the meaning of §20(a) of the 1934 Act as alleged herein.  By virtue of their positions as officers and/or directors of Crestwood and participation in and/or awareness of the Company's operations and/or intimate knowledge of the false statements contained in the S-4 filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which plaintiff contends are false and misleading.

99.      Each of the Individual Defendants and Crestwood was provided with or had unlimited access to copies of the S-4 and other statements alleged by plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

100.     In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.  The S-4 at issue contains the unanimous recommendation of each of the Individual Defendants to approve the Proposed Acquisition, and they were thus directly involved in the making of this document.

101.     Crestwood also had direct supervisory control over composition of the S-4 and the information disclosed therein, as well as the information that was omitted and/or misrepresented in the S-4.

102.     In addition, as the S-4 sets forth at length, and as described herein, the Individual Defendants and Crestwood were each involved in negotiating, reviewing and approving the Proposed Acquisition.  The S-4 purports to describe the various issues and information that these defendants reviewed and considered, descriptions which had input from both the Individual Defendants and Crestwood.

103.     By virtue of the foregoing, the Individual Defendants and Crestwood have violated §20(a) of the 1934 Act.

104.     As set forth above, the Individual Defendants and Crestwood had the ability to exercise control over and did control a person or persons who have each violated §14(a) and SEC Rule 14a-9, by their acts and omissions as alleged herein.  By virtue of their positions as controlling persons, these defendants are liable pursuant to §20(a) of the 1934 Act.  As a direct and proximate result of defendants' conduct, Crestwood's unitholders will be irreparably harmed.

**PRAYER FOR RELIEF**

WHEREFORE, plaintiff demands injunctive relief, in plaintiff's favor and in favor of the Class and against defendants, as follows:

A.     Declaring that this action is properly maintainable as a class action;

B.     Enjoining defendants, their agents, counsel, employees and all persons acting in concert with them from consummating the Proposed Acquisition, unless and until the Company adopts and implements a procedure or process to obtain the highest possible value for unitholders;

C.     Directing the Individual Defendants to exercise their fiduciary duties to obtain a transaction that is in the best interests of Crestwood's unitholders and to refrain from entering

into any transaction until the process for the sale or merger of the Company is completed and the highest possible value is obtained;

D.      Awarding plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees; and

E.      Granting such other and further equitable relief as this Court may deem just and proper.

Respectfully submitted,

EDISON, MCDOWELL & HETHERINGTON LLP

By:_____/s/ Andrew M. Edison_____
    Andrew M. Edison
    Attorney-in-Charge
    Southern District Bar No. 18207

Phoenix Tower
3200 Southwest Freeway, Suite 2100
Houston, Texas 77027
Telephone: 713-337-5581
Facsimile: 713-337-8841
Email: andrew.edison@emhllp.com

Attorney-in-Charge for Plaintiff